No. 621. Wiseman et al. v. Massachusetts et al. Sup. Jud. Ct. Mass. Certiorari denied.

Mr. Justice Harlan, with whom Mr. Justice Douglas and Mr. Justice Brennan join, dissenting.

Petitioners seek review in this Court of a decision of the Massachusetts Supreme Judicial Court enjoining the commercial distribution to general audiences of the film "Titticut Follies." Petitioners' film is a "documentary" of life in Bridgewater State Hospital for the criminally insane. Its stark portrayal of patient-routine and treatment of the inmates is at once a scathing indictment of the inhumane conditions that prevailed at the time of the film and an undeniable infringement of the

privacy of the inmates filmed, who are shown nude and engaged in acts that would unquestionably embarrass an individual of normal sensitivity. The Massachusetts court concluded that the State had standing on behalf of the inmates to bring an injunctive action to protect their right of privacy and that the balance to be struck between the First and Fourteenth Amendments' "commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964), and the individual's interest in privacy and dignity was such that the dissemination of the film should be restricted to audiences of professionals, *e. g.,* lawyers and psychiatrists, with a special interest. 356 Mass. 251, 249 N. E. 2d 610 (1969).

The balance between these two interests, that of the individual's privacy and the public's right to know about conditions in public institutions, is not one that is easily struck, particularly in a case like that before us where the importance of the issue is matched by the extent of the invasion of privacy. As one Federal District Court stated in a case seeking to enjoin distribution of this same movie in New York:

> "The conditions in public institutions . . . are matters which are of great interest to the public generally. Such public interest is both legitimate and healthy. Quite aside from the fact that substantial sums of taxpayers' money are spent annually on such institutions, there is the necessity for keeping the public informed as a means of developing responsible suggestions for improvement and of avoiding abuse of inmates who for the most part are unable intelligently to voice any effective suggestions or protests." *Cullen* v. *Grove Press, Inc.,* 276

F. Supp. 727, 728–729 (D. C. S. D. N. Y. 1967, Mansfield, J.).

This principle underlay this Court's decision in *Barr* v. *Mateo*, 360 U. S. 564, 577 (1959), where it was said:

"The effective functioning of a free government like ours depends largely on the force of an informed public opinion. This calls for the widest possible understanding of the quality of government service rendered by all elective or appointed public officials or employees."

A further consideration is the fact that these inmates are not only the wards of the Commonwealth of Massachusetts but are also the charges of society as a whole. It is important that conditions in public institutions should not be cloaked in secrecy, lest citizens may disclaim responsibility for the treatment that their representative government affords those in its care. At the same time it must be recognized that the individual's concern with privacy is the key to the dignity which is the promise of civilized society. See my dissenting opinion in *Poe* v. *Ullman*, 367 U. S. 497, 522.

The subtlety and importance of the question presented by this case was, by no means, lost on the Massachusetts Supreme Judicial Court:

"That injunctive relief may be granted against showing the film to the general public on a commercial basis does not mean that all showings of the film must be prevented. As already indicated . . . the film gives a striking picture of life at Bridgewater and of the problems affecting treatment at that or any similar institution. It is a film which would be instructive to legislators, judges, lawyers, sociologists, social workers, doctors, psychiatrists, students in these or related fields, and organizations dealing with the social problems of

custodial care and mental infirmity. The public interest in having such persons informed about Bridgewater . . . outweighs any countervailing interests of the inmates and of the Commonwealth (as parens patriae) in anonymity and privacy." 356 Mass. 251, 262, 249 N. E. 2d 610, 618.

These conclusions represent a measured and thoughtful attempt to grapple with a difficult and important problem. Yet they demonstrate the importance of review by this Court for they sharply focus the dimension of the question presented by this case. The question at this juncture is not whether the Supreme Judicial Court was correct or incorrect in striking the constitutional balance, but merely whether this Court should grant certiorari. I fail to see how, on a complex and important issue like this, it can be concluded that this Court should withhold plenary review. The case for review is strengthened by the fact that a distinguished federal judge refused to enjoin in New York the showing of this very same film. This is not of course the traditional conflict that requires this Court to step in, but it underscores the difficulty and importance of the issues that are apparent both from reading the decision of the Massachusetts court and a viewing of the film.

I am at a loss to understand how questions of such importance can be deemed not "certworthy." To the extent that the Commonwealth suggests that certiorari be denied because petitioners failed to comply with reasonable contract conditions imposed by the Commonwealth, that question in itself is one of significant constitutional dimension, for it is an open question as to how far a government may go in cutting off access of the media to its institutions when such access will not hinder them in performing their functions. Cf. *Estes* v. *Texas*, 381 U. S. 532 (1965); *Pickering* v. *Board of Education*,

391 U. S. 563 (1968). In the case before us, however, the only asserted interest is the State's concern for the privacy of the inmates in its care, and the basis for the decision below was the predominance of that interest over that of the general public in seeing the film.

The Commonwealth does not urge, nor could it do so given the opinion of the court below, that the injunction against showing this film was a mere remedy for a breach of contract, assuming the Commonwealth was free to impose whatever restrictions it chose on press access to Bridgewater. The statement in the opinion below that the violation of privacy "taken with the failure of Mr. Wiseman [the producer of the film] to comply with the contractual condition that he obtain valid releases . . . amply justify granting injunctive relief," 356 Mass. 251, 259, 249 N. E. 2d 610, 616, leaves no room for doubt that the invasion of privacy underpins the Massachusetts court's action and that the failure to obtain releases served only to underscore that invasion. The later statement restricting the holding to the mere fact that petitioner Wiseman "violated the permission given to him, reasonably interpreted, and did not comply with valid conditions," 356 Mass. 251, 261, 249 N. E. 2d 610, 617, is not a finding that the relief below is warranted as an award to redress the State for a breach of contract but reiterates merely the fact, already stated, that the invasion of privacy is compounded by the breach of understanding. I see no way to sift out an independent state ground based on contract principles. Moreover, even if the injunction could, in the absence of any discussion of principles of contract law, be viewed as a remedy for a breach of contract, a question of First Amendment dimension is presented when that remedy is to enjoin the dissemination of information of such importance. Cf. *International News Service* v. *Associated Press,* 248 U. S. 215, 248 (1918) (Brandeis, J.,

dissenting); *Pearson* v. *Dodd,* 133 U. S. App. D. C. 279, 410 F. 2d 701 (1969); *New York Times Co.* v. *Sullivan, supra.*

I would grant certiorari and set the case for plenary consideration.