## In re APPLICATION of KSTP TELEVISION for Video Tapes in the Case of

## UNITED STATES of America, Plaintiff,

v.

## MING SEN SHIUE, Defendant.

### No. Cr. 3–80–72.

United States District Court,
D. Minnesota.

Dec. 1, 1980.

William M. Dixon, St. Paul, Minn., KSTP–TV, and Sidney Barrows, Leonard, Street & Deinard, Minneapolis, Minn., for applicant, KSTP–TV.

Thomas P. Kane and Paul R. Hannah, Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, Minn., for applicant WCCO–TV.

Thomas K. Berg, U. S. Atty., and Thorwald H. Anderson, Asst. U. S. Atty., Minneapolis, Minn., for the United States of America.

Warren E. Eastlund and William S. Seeley, Johnson & Eastlund, Minneapolis,

Minn., and M. J. Galvin, Jr. and Terence N. Doyle, Briggs & Morgan, St. Paul, Minn., for Mary Stauffer, objector.

Ronald I. Meshbesher, Kenneth Meshbesher and Carol M. Grant, Meshbesher, Singer & Spence, Minneapolis, Minn., for Ming Sen Shiue, defendant-objector.

Robert W. Johnson, Anoka County Atty., and Robert A. Stanick, Asst. County Atty., Anoka, Minn., for Anoka County Atty., objector.

### MEMORANDUM AND ORDER

DEVITT, Chief Judge.

The issue here centers on the proper exercise of the court's discretion to grant access to its judicial records. The applicant, KSTP–TV, a commercial television station, seeks to view and copy some three hours of video tapes received in evidence in a criminal case, *United States v. Ming Sen Shiue*, 508 F.Supp. 455 (D.Minn.1980). Defendant Shiue was convicted of kidnapping under 18 U.S.C. § 1201 and sentenced to life imprisonment. His appeal to the United States Court of Appeals pends. He is also to be tried, starting January 12, 1981, in Anoka County, Minnesota, state court for kidnapping and murder on substantially the same evidence.

The video tapes sought to be reproduced and disseminated are part of nine hours of color video tapes made by Shiue, an electronics expert. The video tapes record his relations and conversations with one of his kidnapping victims, Mrs. Mary Stauffer, during her captivity in his home. Mrs. Stauffer is a church missionary worker and the wife of a clergyman. The court did not permit showing of the video tapes containing any of the repeated sexual rapes committed upon Mrs. Stauffer. The tapes received in evidence and sought here record conversations and conduct preliminary to, and anticipatory of, the actual sexual acts. The film shows the blindfolded victim lying on a blanket on the floor, her hands and feet bound.

KSTP–TV seeks these tapes on the authority of *United States v. Myers*, 635 F.2d 945, 6 Med.L.Rptr. 1961 (2d Cir. 1980) (hereafter "Abscam" case) and *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), (hereafter "Watergate" case).

The court issued its Order to Show Cause. Appearances were made by defendant Shiue, Mrs. Mary Stauffer, the United States Attorney for the District of Minnesota, the County Attorney of Anoka County, Minnesota, KSTP–TV and WCCO–TV. The nonmedia parties oppose release of the tapes. WCCO–TV, another Twin Cities based commercial television station, joins in the request of KSTP–TV. Oral arguments were heard on November 24, 1980.

The courts of this country recognize a general right to inspect and copy public records. But the interest necessary to support access to them has usually been found in the public's desire to keep a watchful eye on the workings of government and the activities of public officials. Pertinent illustrations of this are cited in *Watergate*, 435 U.S. at 598, 98 S.Ct. at 1312. More recent examples of this reasoning are found in holdings of the District of Columbia Court of Appeals in the Watergate case, *United States v. Mitchell*, 551 F.2d 1252 (D.C.Cir.1976) and in the *Abscam* case.

But the United States Supreme Court has said that the right "to copy judicial records is not absolute," and noted authorities justifying denial of access, such as where the records would promote public scandal by disseminating disgusting details of a divorce or where the records would become reservoirs of libelous statements for press consumption. *Watergate*, 435 U.S. at 598, 98 S.Ct. at 1312.

■ The Court there emphasized that the decision as to access to public records is one to be made by the trial court in light of the relevant facts and circumstances of the particular case, *Id.* at 598–99, 98 S.Ct. at 1312. The *Watergate* Court directs us to exercise "an informed discretion ... with a sensitive appreciation of the circumstances," but we are cautioned that exercising our responsibility "does not permit copying on demand." *Id.*, 603, 98 S.Ct. at 1314.

The basic issue here is whether, with a "sensitive appreciation" for all the facts and circumstances, the court should release the tapes for commercial broadcast to the public. I think not for to do so would support sensationalism. It would not serve the public interest as was served by the wide dissemination of the alleged criminal conduct of high public officials in the Watergate and Abscam cases. Release of the tapes for public dissemination would impinge upon the precious privacy rights of Mary Stauffer, the unfortunate victim of the crime, and would lend the court's approval to the commercial exploitation of a voice and photographic display catering to prurient interests without proper public purpose or corresponding assurance of public benefit.[1]

It should be made clear that there is no "fair trial—free press" or First Amendment issue here. This is not a case concerning exclusion of the press from a trial, *Richmond Newspapers, Inc. v. Virginia,* —— U.S. ——, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), or from a hearing on pre-trial motions. *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). The public has been fully informed by complete news coverage of the trial by all of the media. The tapes were shown in the courtroom for all to see. Complete transcripts were furnished to the media. There is no question here of a truncated flow of information to the public. Notwithstanding this, the electronic media asserts the *right* to copy and publicize the tapes. The Supreme Court, however, has repeatedly held that the media has no such special right. *Estes v. Texas,* 381 U.S. 532, 589, 85 S.Ct. 1628, 1663, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring), 435 U.S. at 609–10, 98 S.Ct. at 1317. Indeed, in *Watergate* the Court noted that,

> The First Amendment generally grants the press no right to information about a trial superior to that of the general public.

435 U.S. 589 at 609, 98 S.Ct. at 1317.

The Court in *Watergate* also made it clear, when discussing its previous holding in *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), that the First Amendment does not entitle the media to the actual evidence for copying but only to the information contained in the tapes. *Watergate,* 435 U.S. 608–09, 98 S.Ct at 1317. In this case that information has been made available by transcript to all the media. This case then does not present a conflict between a First Amendment right and the right of privacy. When, however, two fundamental rights diametrically oppose each other, one must give way to the other. There must then come some point where the public's right to information must bow to the dignity of the individual person. *See, Commonwealth v. Wiseman,* 356 Mass. 251, 258, 249 N.E.2d 610, 615 (1969) *cert. denied,* 398 U.S. 960, 90 S.Ct. 2165, 26 L.Ed.2d 546 (1970) (upholding injunction enjoining commercialization of documentary on conditions in institution for the criminally insane. Film was an outrageous and "indecent intrusion into the most private aspects of the [inmate's] lives."); A. Hill, Defamation and Privacy Under the First Amendment, 76 Col.L.Rev. 1203, 1255–1262 (1976); L. Tribe, American Constitutional Law § 12–14 at 650 (1978) (not-

---

1. Applicants, relying on *Abscam,* argue that the parties objecting to the release of the tapes have failed to show the compelling and extraordinary circumstances necessary to overcome the presumption in favor of public access. Their reliance on *Abscam* in this regard is misplaced. *Abscam* relying primarily on *United States v. Mitchell,* 551 F.2d 1252 (D.C.Cir. 1976), held that "only the most compelling" or "extraordinary circumstances" should prevent contemporaneous public access. 635 F.2d 945, 6 Med.L.Rptr. at 1965. The court in *Abscam* thus appeared to raise the common law right of access to constitutional dimensions. But in *Watergate* the United States Supreme Court declined to elevate the common law right of access to constitutional dimensions. While it is true that the Court in *Watergate* found the existence of the Presidential Recordings Act to be a major factor in its decision, it said that the decision on the release of tapes received in evidence should be left to the sound discretion of the trial judge and cited with approval the authorities for the established exceptions to the common law right of access. Thus, the *Watergate* Court implicitly rejected the notion that the common law right of access rises to First Amendment dimensions.

ing that where public discussion becomes wholly parasitic, nothing in the Supreme Court's decisions suggests that the government must "exalt an abstract right to know, here reduced to a right to gossip, above the deeper concerns of personhood.") Certainly in this case where there is something less than a First Amendment interest at stake, Mrs. Stauffer's right of privacy must prevail.[2]

The *Abscam* case is factually distinguishable. In that case there was a definite public interest in release of the tapes because the tapes involved the alleged wrongdoing of elected public officials. There is, however, no public interest to be served by release of the tapes here, depicting as they do the humiliating and degrading predicament into which Mrs. Stauffer was forced by her captor. She appears lying on the floor, hands and feet bound, prefatory to a rape session. Mrs. Stauffer agreed to the use of the tapes at trial and greatly assisted the government by testifying in painful detail with frankness and courage to the circumstances of the rape and kidnapping. To now expose Mrs. Stauffer to public humiliation and degradation by releasing the tapes for public dissemination would, at best, be unseemly and shameless; it would constitute an unconscionable invasion of her privacy.

Moreover, release of the tapes for copying can serve little, if any, purpose. The trial was open, the public and press were in daily attendance. The media was assured adequate seating, was able to view the tapes at trial and was given a transcript of them. All the information on the tapes has been made available to the public. The

applicants' petition then is simply a request for a particular form of information it already has. The scant value to the public of any additional information inherent in the video tape form is clearly outweighed by the interest of Mrs. Stauffer and of the public in maintaining the dignity of the private person. This additional information, even if of some value, is not the type of information which depicts, criticizes or causes the public to reflect on the workings of society's institutions; it is not the type of information necessary to maintain informed consent for sustaining a free and democratic society. *See Virgil v. Time, Inc.*, 527 F.2d 1122 (9th Cir. 1975) (recognizing cause of action for invasion of privacy where information published was true but not of legitimate public concern); E. Bloustein, The First Amendment and Privacy: The Supreme Court Justice and the Philosopher, 28 Rutgers L.Rev. 41 (1974). In this case any additional information inherent in the video tape form can serve only to accent the morbid and lurid details of the crime and pander to lascivious curiosity.

Another significant, but not necessarily a determinative factor, is that release of the tapes now, and their broadcast, would make choosing fair and impartial jurors at Shiue's forthcoming trial for kidnapping and murder in Anoka County a much more difficult task and would run the risk of impinging upon Shiue's Sixth Amendment right to a fair trial. *See, United States v. Criden*, 501 F.Supp. 854 (E.D.Pa. 1980); *Belo Broadcasting Corp. v. Clark*, (S.D.Tex. Oct. 16, 1980).

In summary, the court is satisfied, after a sensitive evaluation of all the facts here

---

2. The invasion of privacy is "of the same species of wrong" as libel. *Compare Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) with *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring). *See generally*, E. Bloustein, The First Amendment and Privacy: The Supreme Court Justice and the Philosopher, 28 Rutgers L.Rev. 41, 91–92 (1974). Thus, the tapes here well might "serve as reservoirs of [private and intimate] libelous statements for press consumption." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978). In consider-

ing Mrs. Stauffer's interest in her privacy, however, the court does not intend to, *sub silentio*, presage the Minnesota Supreme Court's adoption of a cause of action for the invasion of privacy. *See, Hendry v. Conner*, 303 Minn. 317, 226 N.W.2d 921 (1975). Nor does the court intend to address the merits of the victim's constitutional right of privacy. Rather the court here in exercising its discretion in a non-First Amendment setting is simply weighing the victim's interest in maintaining the dignity of her person against the public's right to know.

that release of the video tapes either to the public or to the electronic media for dissemination would not be for a proper purpose. All of the information in the tapes has already been made available to the public and to the media in the course of an unrestricted public trial. The First Amendment requires no more. Release of the tapes would be inflammatory and serve no public purpose and could only place the court in support of the dissemination of scenes and conversations appealing only to the curiosity and prurient interest of some members of the public. The privacy rights of Mrs. Mary Stauffer, the unfortunate victim, must be respected. As a cooperating key witness in the prosecution, she sacrificed much of herself and overcame a challenge to her personal dignity to respond as a good citizen to the duty to testify. She did so with candor and courage. She is entitled to the consideration and protection of the court from improper out of court dissemination of her forced embarrassing experiences.

The request of KSTP–TV and WCCO–TV for access to the video tapes for copying is DENIED. Any request by a member of the public similarly should be DENIED.

These expressions shall constitute the court's findings of fact and conclusions of law responsive to the command of Fed.R. Civ.P. 52.

The Clerk is directed to establish a separate file in the miscellaneous category for the filing of all papers in connection with this issue.